## Case No. 13,666.

### The SWALLOW.

[1 Ware (21) 13.] [1]

District Court, D. Maine. Dec. Term, 1822.

SHIPPING—PUBLIC REGULATIONS—FISHING VOYAGE
—FRAUDULENTLY OBTAINING BOUNTY—
TRADING—FORFEITURE.

1. The forfeiture of a fishing vessel under the act of July 29, 1813 [3 Stat. 49], for fraudulently obtaining the bounty allowed by that act, does not attach on the improvident payment of the bounty to a vessel not entitled to it, but to the act of fraud and deceit in obtaining it.

2. If the vessel be in fact entitled to the bounty, and fraud and deceit are employed by the owners in obtaining it, she will be subject to forfeiture.

3. A vessel licensed for carrying on the fisheries, is liable to forfeiture under the act of February 18, 1793, § 32 [1 Stat. 316], for a single act of trading, not authorized by the license.

4. The taking of a few cattle, and carrying them from an island to the main land, in going out or returning, not for hire, but as a neighborly or friendly act, is not engaging in a trade within the meaning of the act.

[Cited in The Willie G., Case No. 17,762.]

This was a case of seizure under the revenue laws.

Mr. Shepley, Dist. Att'y, for libellants.
E. Thacher, for claimant.

WARE, District Judge. The libel or information in this case sets out two causes of forfeiture. The first is that of fraudulently obtaining the bounty allowed, by the act of congress of July 29, 1813, to vessels employed in the fisheries. By the 6th section of the act, it is provided, that an allowance of $1.60 per ton shall be paid to a vessel of more than five and less than twenty tons burden, provided she has been actually employed at least four months during the fishing season, and has landed and dried, fit for exportation, at least twelve quintals of fish for every ton of her admeasurement. As a prerequisite to obtaining this allowance, an account of the weight of the fish when they are sold, the original adjustment and settlement of the fares, between the owner and the fishermen, with a description of the vessel, and the time she has been employed, must be submitted to the collector and verified by the oath of the owner. Upon this evidence the allowance is to be paid, and if it shall appear, within one year after the payment, "that any fraud or deceit has been practised in obtaining the same," the vessel is declared to be liable to forfeiture. The bounty having been paid, it is to be presumed that the proper evidence was submitted to the collector, and the question now is whether that evidence was tainted with fraud or deceit.

A good deal of testimony has been introduced to prove that the Swallow was employed the requisite time, and that the required quantity of fish was taken and cured.

The evidence is pertinent, so far as it shows an absence of all temptation to the practice of fraud. There can be no doubt that the vessel was employed at least four months during the season, and it is shown by a pretty strong probability that as much as 156 quintals of fish, the amount required to entitle a vessel of her tonnage to the allowance, were taken and cured. This may be all true, and the forfeiture not escape forfeiture. The forfeiture attaches on the practice of fraud and deceit in obtaining the allowance. The vessel may bring herself within the law as to the time employed and the amount of fish taken, yet if the owner has employed corrupt evidence in obtaining the bounty, the vessel is forfeited by the express words of the statute. As, if part of the fish had been disposed of without securing the proper evidence, to be submitted to the collector, as to the part thus sold, and the owner obtains the allowance on false or fabricated evidence, with respect to fish taken not in his boat but in another; this would be fraud and deceit, which would be followed by a forfeiture. It would be no defence to prove that the required amount of fish was in fact taken and cured. Again, if the collector should improvidently pay the bounty to a vessel, which was not in fact entitled, there would be no forfeiture if the owner had practised no fraud or deceit in obtaining it. The forfeiture attaches not upon the payment of the bounty to a vessel not entitled to it, but to the act of obtaining it by fraud and deceit. The question then is, whether such fraud has been employed in the present case. The only evidence which implicates the vessel, is that of Sweetland. He states that he was with Snow, the skipper, one trip in the Swallow, in the month of October; that while lying at Matinicus, where she usually went for a harbor, he had a conversation with the skipper on the subject of obtaining the bounty, and Snow gave him to understand that he intended to obtain it by corrupt evidence; that while they were in the harbor, they landed a small quantity of fish, which were sold to Mr. Buck, a trader, who gave a receipt for them. This receipt, the witness thinks was written by Snow before he left the vessel, and was for a larger quantity of fish than in fact were sold to Buck. The witness did not read it himself, but heard Snow read it, and the exact amount of fish expressed, he does not pretend to recollect. Buck at first declined to sign the receipt, but at last consented, and the witness understood from Snow that he intended to use this in obtaining the bounty. If a receipt thus obtained were used, there cannot be a doubt but it was a fraud, which would work a forfeiture. But it is to be remarked that the fact rests on the unsupported testimony of a single witness. An attempt has been made to discredit him, but I can see no sufficient reason for leaving his testimony out of the case. I admit it as far

[1] [Reported by Hon. Ashur Ware, District Judge.]

as it goes. But it proves at most that Snow at one time had an intention of using fraudulent means to obtain the bounty, not that he actually used it; and it is not in proof, by other testimony, that this receipt was used. This is not such proof as is required to justify a decree of forfeiture.

The next allegation in the libel relied upon is, that the Swallow was employed in another trade than that for which she was licensed, and is forfeited under the 32d section of the coasting act of February 18, 1793. The facts are not disputed. At one time, when she was on her way to the fishing ground, she touched at the Green Islands and took twelve or thirteen sheep, and carried them to Matinicus; and two or three days after, when returning home, she took from Matinicus, four or five neat cattle, and landed them at Thomaston. She does not appear to have gone out of her way, or to have been detained at most more than an hour or two in the whole of the business. There is no evidence that this was done for hire; with respect to the sheep, the proof is that it was not, and such is, I think, the presumption in the other case. They appear to have been merely acts of good neighborhood, which fishermen in that place are in the habit of doing for each other, and for which no compensation is expected, except in the way of similar favors. It is also worthy of remark, that the sheep and cattle were not sold, but merely removed from one part of a man's farm to another, there being no conveyance by land. Is this employing the vessel in a trade within the meaning of the 32d section of the act? It has been well settled by a variety of decisions that the forfeiture of this section attaches in every case of trading, of whatever nature and with whatever object, which is not expressly within the license. The Eliza [Case No. 4,346]. The revenue and navigation laws of the country constitute a system framed for the protection of great public interests, and is of a very unbending character. If a party has a case which presents equitable grounds for relief, that must be sought in another quarter. The only duty which the court has to perform is to administer the law according to its obvious import, but the court is not called upon to give a strained construction of those laws, so as to include cases which are not within the meaning of the words in their ordinary acceptation. I have looked into the cases, and do not find, what indeed could hardly be expected, a case precisely like the present. They are all cases of trade in the common acceptation of the word, the conveyance of merchandise in the ordinary course of commercial transactions. The Active, 7 Cranch [11 U. S.] 100, was laden with provisions, and manifestly intended for a foreign voyage. The Three Brothers [Case No. 14,009] purchased in a foreign port a considerable quantity of fish, and was, in every sense of the word, engaged in trade. The Two Friends [Id. 14,289] had taken on board upwards of one hundred barrels of flour, and was avowedly destined from Boston to Chelsea, but probably for a very different voyage. The Eliza [supra] had taken on board, as freight, a quantity of wine and provisions, and was seized while in pursuit of a foreign vessel, for which she was destined, and that, probably, an enemy. All these cases are widely different from the present. They are all clearly cases of engaging in a trade, in the usual meaning of the word, and they undoubtedly show that a single act of trading, beyond the authority of the license, is fatal. But can it in propriety of language be said that if a small fishing schooner, employed in the coast fisheries, while on her way to or from, the fishing grounds, takes a few articles of provisions, or a few cattle, at one place and drops them at another, without being diverted from her course or occupation, and without any contract of hire or compensation, or expectation of compensation, except that of a reciprocation of the same offices of good neighborhood on another occasion,—can a vessel, under such circumstances, be said to be engaged in a trade within the meaning of the law? This would be extending the restrictions of the law further than any decision has yet carried them. I cannot think that this kind of interchange of neighborly acts falls within the words or policy of the law. I decree a restoration of the boat, but shall certify probable cause of seizure.